RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 11-1637

JOANNE TRAGAS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:09-cr-20023-10—Thomas L. Ludington, District Judge.

Argued: August 2, 2013

Decided and Filed: August 23, 2013

Before: CLAY, SUTTON, and GRIFFIN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Erik W. Scharf, SCHARF APPELLATE GROUP, Miami, Florida, for
Appellant. Janet Parker, UNITED STATES ATTORNEY'S OFFICE, Bay City,
Michigan, for Appellee. **ON BRIEF:** Erik W. Scharf, Wayne R. Atkins, SCHARF
APPELLATE GROUP, Miami, Florida, for Appellant. Janet Parker, UNITED STATES
ATTORNEY'S OFFICE, Bay City, Michigan, for Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. Defendant Joanne Tragas was indicted on numerous
charges relating to her participation in an international credit and debit card fraud
conspiracy. She was convicted by a jury and sentenced to 300 months' imprisonment.
On appeal, Defendant challenges her conviction by arguing that the prosecutor
improperly read certain evidence aloud, that the district court should have given the jury
a specific unanimity instruction, that her Travel Act convictions were not supported by

1

sufficient evidence, and that her Vienna Convention rights were violated. She further argues that the district court improperly calculated her sentence by using an incorrect version of the Sentencing Guidelines in violation of the Ex Post Facto Clause. We reject Defendant's challenges to her conviction but agree that the district court used an incorrect version of the Guidelines. Accordingly, we **AFFIRM** Defendant's convictions, **VACATE** her sentence, and **REMAND** for resentencing.

## BACKGROUND

The evidence at Defendant's trial established that she acted as a middleman between overseas suppliers of stolen credit and debit card information and street-level users of that information. Defendant's suppliers obtained the information that is typically encoded in the magnetic strip on the back of credit and debit cards and sold the information to her using international wire transfers. After receiving the stolen data, Defendant re-sold the information to her co-conspirators in the United States. Defendant's customers, many of whom later became her co-defendants, used machines to encode the information they received from Defendant onto the magnetic strips of actual plastic cards. Any card with a magnetic strip could be and was used, including gift cards, hotel key cards, and actual credit cards. Once encoded, these cards contained the same information that the legitimate cards contained.

Thus armed with these "clones" of legitimate credit and debit cards, the conspirators purchased various kinds of consumer goods, including high-end electronics, as well as bona fide gift cards. In this way, the conspirators could quickly convert stolen credit card information into cash or easily transferable property. Defendant's primary customers in Detroit were twin brothers Dion and Dionte Hunter, who purchased stolen credit and debit card information from Defendant and then either used it themselves or sold it to others. Defendant and the Hunters never met in person, but they communicated extensively via online chat services, which were variously described as instant messages or "ICQ's." Police discovered stored records of these chat conversations on a laptop computer belonging to the Hunters.

The government introduced the transcripts of these chat conversations into evidence, and the prosecutor, together with Secret Service Agent Robert Kuykendall, read many of the conversations aloud to the jury. Although the parties to these communications did not use names, a picture of Defendant was the profile picture associated with the ICQ account-holder that supplied the Hunters with stolen data. Furthermore, Defendant was shown to have made purchases with the gift card information exchanged during the ICQ conversations with the Hunters. Circumstantial evidence also indicated that the individual conversing with the Hunters and supplying them with stolen information was in fact Defendant. For example, Defendant purchased a house in Florida after the Hunters' supplier talked of buying and furnishing a new beach house in Florida.

These conversations revealed the scope and nature of Defendant's role in the conspiracy. She sold credit and debit card information to the Hunters in exchange for payment in a variety of different forms, including cash deposits into her bank account, wire transfers, and information that allowed her to use the genuine gift cards that the Hunters and others purchased with stolen card data. Defendant used the money she received to pay her overseas suppliers, and she sometimes directed the Hunters to wire money directly in order to facilitate these payments. Defendant purchased and re-sold the stolen personal information of hundreds of credit and debit card users, and their financial institutions suffered losses of approximately $2.18 million as a result.

Defendant was arrested in June 2009 and was ultimately charged in a superseding indictment with one count of conspiracy to commit various access device fraud offenses, in violation of 18 U.S.C. § 1029(b); seven counts of aiding and abetting unlawful activity under the Travel Act, in violation of 18 U.S.C. § 1952(a); one count of bank fraud, in violation of 18 U.S.C. § 1344; and two counts of wire fraud, in violation of 18 U.S.C. § 1343. A jury convicted Defendant on all counts. A presentence report was prepared, and Defendant filed numerous objections to its findings and recommendations. However, at the sentencing hearing on April 27, 2011, Defendant specifically withdrew all her objections to the presentence report. Based on a recommended Sentencing

Guidelines range of 292–365 months in prison, the district court sentenced Defendant to a total term of imprisonment of 300 months, to be followed by a five-year term of supervised release.

## DISCUSSION

### I.          Reading Evidence Aloud

Defendant first argues that a new trial is warranted because the prosecutor, together with Agent Kuykendall, read to the jury transcripts of online chat conversations between Defendant and her co-conspirators.  The exact basis for Defendant's objection to this evidence is difficult to pin down, but for the reasons that follow, we find nothing improper in the reading aloud of a properly admitted transcript under these circumstances.  Although Defendant's counsel initially had no objection to the testimony, he subsequently objected on the ground that reading the documents was cumulative because the transcripts had already been admitted into evidence.  Construing Defendant's argument as an evidentiary challenge, we review a district court's ruling on the admissibility of evidence for an abuse of discretion.  *United States v. Yu Qin*, 688 F.3d 257, 261 (6th Cir. 2012).  If her claim is more akin to an allegation of prosecutorial misconduct, we review the claim *de novo.  United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011).  Under either standard of review, Defendant's argument fails.

The argument is rather unusual.  Defendant does not seem to dispute that the written communications were properly admitted into evidence under the hearsay exclusion in Federal Rule of Evidence 801(d)(2).  Instead, she argues that merely by reading the transcripts aloud, the prosecutor and the case agent conducted a "theatrical performance" akin to a re-enactment. Defendant argues that the prosecutor and Agent Kuykendall essentially play-acted the chat conversations, with the prosecutor "performing" the role of Defendant, and Kuykendall playing various co-conspirators. In so doing, Defendant argues, the prosecutor interpreted and characterized the otherwise properly admitted documentary evidence and portrayed Defendant's written communications in a way that telegraphed to the jury that she was guilty.

However, Defendant offers no support for her proposition that the mere reading aloud of previously admitted documentary evidence is improper or prejudicial. On the contrary, there is nothing inherently problematic about reading such evidence to the jury. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 262–63 (1988) (finding no prejudice to a defendant where two IRS agents read in tandem from a transcript before a grand jury); *United States v. Chambers*, 441 F.3d 438, 456–57 (6th Cir. 2006) (finding no unfair prejudice where a police officer read portions of a defendant's previously admitted diary to the jury). As long as the evidence itself is properly admitted pursuant to the Rules of Evidence and does not run afoul of other safeguards like the Confrontation Clause, we do not see how a defendant could be prejudiced if the evidence is read aloud to the jury.

Although Defendant decries what she asserts was a "remarkable departure from traditional American trial practice," she points to nothing in the record that would suggest that the prosecutor and case agent did anything other than read the transcripts aloud. A staged performance or re-enactment of an event by a prosecutor would undoubtedly be problematic insofar as it strayed from the direct evidence introduced at trial or reflected the prosecutor's opinions, although we have approved video re-enactments in certain circumstances. *See, e.g.*, *Persian Galleries, Inc. v. Transcontinental Ins. Co.*, 38 F.3d 253, 257–58 (6th Cir. 1994). However, the prosecutor's conduct in this case cannot possibly be described as a re-enactment. Although Defendant points to some minor discrepancies between the reading and the written text, none of these discrepancies are material, and the jury had copies of the written transcripts with which to follow along. Nothing in the record indicates that the prosecutor or Agent Kuykendall "performed" a scene in any meaningful sense. Rather, they merely read aloud from documents that Defendant concedes were properly admitted into evidence.

In addition to her broad contention that the prosecutor and the case agent were doing theater, Defendant raises several specific challenges to the testimony. First, she asserts that the testimony presented an improper overview or summary. A defendant

may indeed be prejudiced if a law enforcement officer is able to introduce otherwise inadmissible evidence by giving an overview of the government's case at the outset of the trial, *see United States v. Casas*, 356 F.3d 104, 119–20 (1st Cir. 2004), but once again, Defendant does not contend that the chat conversations themselves were inadmissible. Moreover, Kuykendall cannot be said to have summarized anything; rather, he was merely reading directly from a transcript that had already been provided to the jury in written form. Even if Kuykendall had summarized other evidence, Defendant concedes that the jury was properly instructed regarding summary evidence. *See United States v. Vasilakos*, 508 F.3d 401, 412 (6th Cir. 2007); *United States v. Weinstock*, 153 F.3d 272, 278 (6th Cir. 1998) (finding no error in admitting a summary to facilitate the jury's consideration of previously admitted evidence).

Next, Defendant argues that the prosecutor's reading of the chat conversations constitutes impermissible vouching, which occurs when "a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness." *United States v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004). This seems to be a different theory to support Defendant's primary argument that, merely by uttering the words from a document aloud, a prosecutor imbues the evidence with some sort of magical power. However, Defendant fails to identify any comments or statements that could be construed as bolstering or vouching for the evidence, and we find no support for the proposition that admissible documentary evidence somehow becomes more credible if the prosecutor reads it aloud.

Finally, Defendant contends that because the prosecutor is not a witness and cannot be cross-examined, any opinions, testimony, or interpretations of evidence offered by the prosecutor are prohibited by the Confrontation Clause of the Sixth Amendment. As with her other arguments, Defendant's contention fails because she can point to nothing in the record indicating that the prosecutor actually made any such statements or verbally interpreted the evidence in any particular way. As for the transcripts themselves, we note that Defendant's own statements were properly admitted

as statements by a party-opponent under Rule 801(d)(2)(A), and the statements by the Hunters were admitted as co-conspirator statements under Rule 801(d)(2)(E).  As co-conspirator statements made in furtherance of the conspiracy, they were categorically non-testimonial and also within a "firmly rooted" exception to the hearsay rule.  *See United States v. Mooneyham*, 473 F.3d 280, 286–87 (6th Cir. 2007) (citing *Crawford v. Washington*, 541 U.S. 36, 51 (2004), and *Bourjaily v. United States*, 483 U.S. 171, 183–84 (1987)). Therefore, the Confrontation Clause does not bar their admission.  *Id.* at 287.  Because we find no inherent problem—constitutional or otherwise—when a prosecutor and a witness merely read aloud from a properly admitted transcript, we reject Defendant's first challenge to her conviction.

## II.    Specific Unanimity Instruction

The indictment charged Defendant with a conspiracy to "commit an offense or offenses contrary to 18 U.S.C. § 1029(a)(1), (2), (3), (4), and (5)."  (R. 229, at 2.) Defendant argues that the district court should have instructed the jury to unanimously determine which, if any, of those five offenses she conspired to commit.  Because Defendant failed to object to the jury instructions or request a specific unanimity instruction, this claim is reviewed for plain error.  *United States v. DeJohn*, 368 F.3d 533, 540 (6th Cir. 2004).  To obtain relief under this standard, Defendant must show that (1) there was an error (2) that was plain, (3) that affected a substantial right, and (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  *United States v. Martin*, 520 F.3d 656, 658 (6th Cir. 2008).

The Sixth Amendment does not expressly require that jury verdicts be unanimous, but the Supreme Court has long held that jury unanimity is "one of the indispensable features" of federal criminal trials.  *Johnson v. Louisiana*, 406 U.S. 366, 369–71 (1972) (Powell, J., concurring).  In practice, this means that "a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element [of the crime]."  *Richardson v. United States*, 526 U.S. 813, 817 (1999). For defendants charged with conspiracy, the object offense of the conspiracy is an element of the crime.  *See United States v. Caver*, 470 F.3d 220, 232 (6th Cir. 2006).

Therefore, where a defendant is charged in a single count with a conspiracy to commit multiple crimes, the jury must unanimously decide which crime the defendant conspired to commit.  *See United States v. Long*, 450 F. App'x 457, 460 (6th Cir. 2011); *United States v. Capozzi*, 486 F.3d 711, 717–18 (1st Cir. 2007); *United States v. Hughes*, 310 F.3d 557, 561 (7th Cir. 2002).

The government argues that the indictment alleged a conspiracy to commit a single offense: access device fraud.  In contrast, Defendant argues that she was charged with conspiring to commit five separate offenses.  The statute defines the offenses in these subsections as follows:

> (a) Whoever–
>
>> (1) knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices;
>>
>> (2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period;
>>
>> (3) knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices;
>>
>> (4) knowingly, and with intent to defraud, produces, traffics in, has control or custody of, or possesses device-making equipment;
>>
>> (5) knowingly and with intent to defraud effects transactions, with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000 . . .
>
> shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

18 U.S.C. § 1029(a).  The district court clearly considered subsections (1)–(5) of the statute as descriptions of different ways that an individual could commit the single offense of access device fraud, rather than five distinct offenses.

We decline to delve into the intricacies of the interpretation of § 1029(a) in this case because, even if we assume that the district court's construction was erroneous and that the error was plain, Defendant cannot satisfy the third prong of the plain error standard, that the error affected her substantial rights. *Martin*, 520 F.3d at 658. The Supreme Court has clearly held that a district court's failure to instruct the jury as to all the elements of a crime is not structural error that necessitates a new trial. *Neder v. United States*, 527 U.S. 1, 9 (1999). Similarly, a district court's failure to instruct the jury that they must unanimously agree on each element of a crime is not structural error, but instead is subject to harmless-error review. *See Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000).

We find that Defendant's substantial rights were not affected by any error in the jury instructions. By finding Defendant guilty of conspiracy, the jury necessarily concluded that she voluntarily joined the Hunters and their compatriots in creating and using counterfeit access devices. (*See* R. 365, at 83 (instructing the jury that it must find that "the defendant knowingly and voluntarily joined the conspiracy" to convict her on Count 1).) To properly convict, the jury would have only had to find that Defendant conspired to commit one of the offenses in § 1029(a)(1)–(5). The evidence that the conspirators intended to commit at least a violation of subsection (1) is overwhelming.

The evidence more than established that the Hunters and others conspired to produce and use counterfeit access devices with the intent to defraud in violation of § 1029(a)(1). Indeed, they admitted as much in their plea agreements. Numerous co-conspirators and law enforcement agents testified that members of the conspiracy had used fraudulently "cloned" cards to make purchases. Gift cards recovered from co-conspirators were shown to have been re-encoded with fraudulently obtained credit card information. Each of these would qualify as a "counterfeit access device" within the meaning of the statute. *See* 18 U.S.C. § 1029(e)(2). Given the volume of evidence that Defendant conspired with others to violate at least one of the substantive offenses defined in § 1029(a), there is no risk that the jury could have failed to unanimously agree

on the object of the conspiracy. Therefore, Defendant's substantial rights were not affected, and the elements of plain error are not satisfied.

## III.     The Travel Act Counts

Defendant argues that the government's evidence was insufficient to support her convictions on seven counts of aiding and abetting unlawful activity under the Travel Act, 18 U.S.C. § 1952(a) (Counts 2–8). When reviewing a criminal conviction for sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*. 443 U.S. 307, 319 (1979). "All reasonable inferences and resolutions of credibility are made in the jury's favor." *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012). A convicted defendant bears "a very heavy burden" to show that the government's evidence was insufficient. *United States v. Kernell*, 667 F.3d 746, 756 (6th Cir. 2012). As is generally the case, circumstantial evidence alone may be sufficient to support a conviction. *Untied States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010).

Where, as here, a defendant does not move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, we review the sufficiency of the evidence only for plain error resulting in a "manifest miscarriage of justice." *United States v. Frazier*, 595 F.3d 304, 306 (6th Cir. 2010). "A miscarriage of justice exists only if the record is devoid of evidence pointing to guilt." *United States v. Roberge*, 565 F.3d 1005, 1008 (6th Cir. 2009) (internal quotation marks omitted).

To prove a violation of § 1952(a), the government was required to establish the following elements: "(1) that the defendant 'travels in interstate or foreign commerce' (2) 'with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity' and (3) that the defendant 'thereafter performs or attempts to perform' an act of promotion, management, establishment, or carrying on of any unlawful activity." *United States v. Burns*, 298 F.3d 523, 537 (6th Cir. 2002) (quoting the statute). The government did not allege that Defendant herself violated the Travel Act by crossing state lines in aid of criminal

activity, but rather that she aided and abetted the interstate travel of the Hunters in furtherance of the access device fraud scheme. To support aider and abettor liability, Defendant must have had "general knowledge regarding the activities prohibited under the [Travel Act] and the intent to assist those activities." *United States v. Hill*, 55 F.3d 1197, 1204 (6th Cir. 1995).

Defendant's only argument that the evidence was insufficient is that the government did not prove she had knowledge of the Hunters' interstate travel *at the time* she received unlawful money transfers and gift card information. However, Defendant points to no legal authority to support the proposition that contemporaneous knowledge of interstate travel is required to establish that a defendant aided or abetted a violation of the Travel Act. Although most other circuits have held that a Travel Act defendant need not have specific knowledge of any interstate travel, the Sixth Circuit has held that a defendant must at least be generally aware of the principal's interstate travel. *See United States v. Gallo*, 763 F.2d 1504, 1521–22 (6th Cir. 1985).[1] However, a defendant need not "know the circumstances of each instance of travel or the identity of each traveler-participant in a criminal activity." *Id.* at 1522.

The evidence at trial established that Defendant was aware that the Hunters traveled across state lines from their home in Detroit in furtherance of the access device fraud scheme. Online conversations between Defendant and the Hunters established that the Hunters wired Defendant money or gave her gift card information as payment for stolen credit card numbers. Dionte Hunter wired money from Atlanta, Louisville, and a town just outside Pittsburgh. The government further proved that Defendant used gift cards to make online purchases and that the gift cards were purchased in Kentucky, Texas, Ohio, and Pennsylvania.

---

[1]We have acknowledged several times that this rule is likely untenable in light of the Supreme Court's decision in *United States v. Yermian*, 468 U.S. 63 (1984), in which the Court held that a criminal defendant need not have knowledge of a jurisdictional fact to support liability under a federal statute. *Id.* at 68–69. However, we need not expressly decide whether *Yermian* overruled prior Sixth Circuit precedent because Defendant's conduct satisfies either test.

Based on Defendant's responses in her online conversations with the Hunters and the originating cities of the gift cards and wire transfers, a reasonable jury could have found that Defendant had knowledge of the Hunters' interstate travel. Defendant specifically acknowledged several times that Dionte Hunter was in states other than Michigan. Most significantly, when Hunter complained that some of the stolen credit card information had not worked, Defendant explained that he had probably been in a different state, and she encouraged him to move around to other states. When Hunter said that he had been having trouble purchasing gift cards in Michigan, Defendant told him to move to another state like Maryland. Although the evidence was not overwhelming, it was sufficient to establish that Defendant was generally aware that the Hunters traveled interstate to facilitate the access device fraud scheme and that she intended "to assist those activities." *Hill*, 55 F.3d at 1204. Therefore, we reject Defendant's challenge to her Travel Act convictions.

## IV.    Vienna Convention

Defendant asserts that under Article 36 of the Vienna Convention, the government was obligated to inform her of her right to consular access because she is a citizen of Greece and Canada. However, Defendant acknowledges that this panel is bound by our decision in *United States v. Emuegbunam*, 268 F.3d 377 (6th Cir. 2001), which held that the Vienna Convention does not confer rights on individual criminal defendants that are enforceable by the federal courts. *Id.* at 389–90. Defendant acknowledges that we are bound by *Emuegbunam*, and she raised this argument only to preserve the issue for possible future review by the en banc Sixth Circuit or the Supreme Court. On the authority of *Emuegbunam*, we reject this argument.

## V.    Ex Post Facto Violation at Sentencing

Defendant argues that the district court erroneously imposed a 6-level enhancement for an offense involving more than 250 victims under U.S.S.G. § 2B1.1(b)(2)(C). Defendant failed to raise this argument before the district court, and she concedes that we review her sentence for plain error only. *See United States v.*

*Davis*, 397 F.3d 340, 346 (6th Cir. 2005).  Because the district court calculated the number of victims using a Guidelines amendment that was not in effect when Defendant's offense was committed, we conclude that her sentence violates the Ex Post Facto Clause.[2]

Defendant did not object to the PSR's determination that her offense involved more than 250 victims.  In her initial brief on appeal, Defendant argued that the district court committed plain error by counting as "victims" individuals who did not suffer financial harm.  *See* Appellant's Br. 47–50.  The government countered in its appellate brief that the Sentencing Commission had amended the Guidelines in 2009 to expand the definition of "victim" to those who have had their identities stolen.  *See* U.S.S.G. § 2B1.1 cmt. n.4(E).  Then, in her reply brief, Defendant argued that the application of the 2009 amendment's definition of "victim" violates the Ex Post Facto Clause. Although this was the first time that Defendant challenged the enhancement on ex post facto grounds, she has not forfeited the argument on appeal because it was a direct response to an argument first made by the government in its brief.  *See Holloway v. Brush*, 220 F.3d 767, 773–74 (6th Cir. 2000).

At oral argument, the government essentially conceded that the district court erred when it used the Guidelines' amended definition of "victim."  Generally, district courts must apply the version of the Guidelines in place at the time of sentencing. U.S.S.G. § 1B1.11(a).  However, if applying the current Guidelines would amount to a violation of the Ex Post Facto Clause, the Guidelines clearly instruct the court to apply the version in place at the time the defendant's offense was committed.  U.S.S.G. § 1B1.11(b)(1).  Although the Sixth Circuit had already held as much, the Supreme Court recently confirmed that a sentence violates the Ex Post Facto Clause if the defendant's Guidelines range is higher at the time of sentencing than it would have been

---

[2]Defendant also contends that the district court erroneously applied a 3-level aggravating role enhancement under U.S.S.G. § 3B1.1(b).  Because we vacate Defendant's sentence based on the ex post facto error, we decline to reach Defendant's second challenge to her sentence.  On remand, the district court will be free to conduct a *de novo* resentencing, and any issues that arise from that proceeding can be raised in a subsequent appeal.  *See United States v. Saikaly*, 207 F.3d 363, 369 (6th Cir. 2000) (discussing the principles of *de novo* resentencing).

when the offense was committed. *See Peugh v. United States*, 133 S. Ct. 2072, 2088 (2013); *see also United States v. Welch*, 689 F.3d 529, 533 (6th Cir. 2012).

Defendant was indicted for a conspiracy that ended on July 20, 2009, the date that she was arrested. Prior to November 1, 2009, the Guidelines defined "victim" as "any person who sustained any part of the actual loss" or "any individual who sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1 cmt. n.1 (2008). Many circuits, including our court, had held that this definition did not include victims of identity theft who had been reimbursed by their banks or credit card companies. *See United States v. Yagar*, 404 F.3d 967, 971 (6th Cir. 2005); *see also United States v. Kennedy*, 554 F.3d 415, 419–22 (3d Cir. 2009) (collecting cases). Under the old definition of "victim," the fraud perpetrated by Defendant would have involved only the fifteen banks, credit unions, and financial services companies that suffered actual losses, not the individuals whose credit and debit card information was stolen. Her base offense level would have been increased by 2 levels because her offense involved more than ten, but less than fifty, victims. *See* U.S.S.G. § 2B1.1(b)(2)(A).

After November 2009, the Guidelines expanded the definition of "victim" to include "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1 cmt. n.4(E) (2009). Based on this definition, the PSR and the district court counted as a victim each of the individuals whose identities were stolen by Defendant and her co-conspirators, and Defendant's offense level was increased by 6 levels. *See* U.S.S.G. § 2B1.1(b)(2)(C). As a result of the 6-level enhancement and others, the recommended Guidelines range at sentencing was 292–365 months in prison, and Defendant was sentenced to a term of 300 months. Had she been sentenced under the version of the Guidelines in effect when her conduct was committed, the Guidelines range would have been a significantly lower 188–235 months. *See* U.S.S.G. § 5A. Because the amendment increased the Guidelines range based on conduct that occurred before its effective date, its application violated the Ex Post Facto Clause. *Welch*, 689 F.3d at 553. We have held that a district court commits plain error when it applies a version of the Sentencing Guidelines in violation of the Ex Post Facto Clause. *See*

*Davis*, 397 F.3d at 348–49.  Particularly where the error results in a sentencing range nearly 100 months higher than it would otherwise have been, we have no trouble finding that the elements of plain error are satisfied here.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** Defendant's convictions, **VACATE** her sentence, and **REMAND** for resentencing.