RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

QUENTIN SHERER (13-1821); MARTIN TUCKER (13-2619),

*Defendants-Appellants.*

Nos. 13-1821/2619

—————————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cr-20706—Robert H. Cleland, District Judge.

Decided and Filed: October 22, 2014

Before: BOGGS, SUTTON, and STRANCH, Circuit Judges.

—————————————

## COUNSEL

—————————————

**ON BRIEF:** Paul M. Laufman, LAUFMAN & NAPOLITANO, LLC, Cincinnati, Ohio, for Appellant in 13-1821. Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellant in 13-2619. Frances Lee Carlson, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

—————————————

## OPINION

—————————————

SUTTON, Circuit Judge. Quentin Sherer had a habit of robbing banks. Martin Tucker made a living as a semipro boxer. Together, they stole $6,000 dollars from a Michigan credit

1

union. Separately, they challenge their sentences and convictions on six grounds. We affirm the district court in all respects.

I.

In 2009, two masked men burst into the Monroe County Community Credit Union waving guns. The taller man—a light-skinned African American wearing a black hooded sweatshirt—forced bank teller Alice Norris to give him the money in her drawer. The shorter man—fully masked and wearing a gray hooded sweatshirt—confronted Anthony Scorziello, Norris's coworker, who turned over the money in his drawer as well. Scorziello had the presence of mind to include a "dye pack" with the bounty: four twenty-dollar bills wrapped around a tear-gas grenade. The dye pack exploded as the robbers sped away in their Pontiac, spewing gas and red smoke into the air.

John Kortas, a customer, witnessed the robbery through the bank's drive-through window. After dialing 911, he pulled out of the parking lot and pursued the fleeing car, providing the police with its plate number in the process. Along the way, he saw the robbers pitch a bag out the window, red dye "coming out [of it] like smoke." *Sherer* R. 85 at 135. Kortas chased the two across the Michigan-Ohio border to Toledo, where they eventually ditched the car and managed to elude Kortas and the police.

The FBI and local authorities spent two years investigating the crime. In 2011, a federal grand jury indicted Quentin Sherer on two offenses: bank robbery, *see* 18 U.S.C. § 2113(a), and use of a firearm in relation to a crime of violence, *see* 18 U.S.C. § 924(c). Nine months later, it added Martin Tucker to both counts of the indictment.

Several damning facts came to light during the trial. The getaway car had been stolen the night before the robbery, and the FBI recovered Tucker's DNA from its steering wheel. Investigators discovered a pair of gloves, a t-shirt, and a knit cap near the abandoned Pontiac. DNA on the first two items matched Sherer's, while DNA on the third matched Sherer's and Tucker's. Tucker stands 5'7" without shoes and is a light-skinned African American, just like the man in black. Sherer stands 5'3" and has the word "southpaw"—a term for a left-handed pitcher—tattooed on his body, the same height and handedness as the man in gray. Sherer and

Tucker were known associates (as evinced by a photo from Sherer's MySpace page dated "summer '09") and lived just blocks apart from each other—and from the home of the Pontiac's rightful owner. In the ten days before the robbery, they tried to call each other twenty-seven times.

The jury also heard considerable testimony about the guns used in the crime. A customer described how Tucker touched a gun to her hair, explaining that it "was kind of heavy . . . when it hit. It wasn't like [the gun] was plastic." *Sherer* R. 85 at 72. Norris said she "thought [Tucker's gun] was real" because it resembled the handguns her husband kept at home. *Id.* at 94–95. Scorziello initially thought Sherer's gun was fake but, after learning to shoot between the time of the robbery and the trial, he changed his mind, citing the gun's metallic appearance, its apparent weight, and its layout. And FBI Agent George Nikolopoulos—competitive shooter, two-decade SWAT veteran, and FBI- and NRA-certified gun instructor—identified both guns as real based on enhanced photos from the bank's surveillance tapes.

The jury found both defendants guilty. Tucker received a 147-month sentence; Sherer, a 540-month sentence. The defendants appeal, raising three claims apiece.

## II.

*The Speedy Trial Act.* Sherer claims that his trial should never have happened. In his view, the district court improperly denied his motion to dismiss under the Speedy Trial Act. The Speedy Trial Act requires the Government to try a defendant within seventy days of his indictment or first appearance, whichever is later, and lists a number of excusable delays that do not subtract time from the clock. 18 U.S.C. § 3161(c)(1), (h). To benefit from the statute, a defendant must first ask the district court to dismiss the charges against him. *Id.* § 3162(a)(2).

Sherer's failure to comply with the Act's instructions nips his claim in the bud. His motion to dismiss did not allege a violation of the Act—a "simple matter of producing a calendar and showing that more than seventy days have passed since the indictment (or first appearance) and trial has yet to begin." *United States v. Jenkins*, 92 F.3d 430, 438 (6th Cir. 1996). The Government's clock began ticking on November 10, 2011, the day his indictment came down.

Sherer filed his motion on January 6, 2012, fifty-seven days later.  A Speedy Trial Act violation does not occur thirteen days *before* the Government's time runs out.

Sherer's head-scratching choice to file a premature motion may be explained by the fact that, on January 4, 2012, the district court granted the government's request to postpone the trial until March 5, 2012.  But even if this continuance was a problem (it was not as we explain below), Sherer still could not prevail.  As our sister circuits have held and as we agree, "a motion for dismissal [under the Speedy Trial Act] is effective only for periods of time which antedate [its] filing." *United States v. Connor*, 926 F.2d 81, 84 (1st Cir. 1991).  "[A] court need only consider alleged delay which occurs prior to and including the date on which the motion is made.  The right to challenge any subsequent delay is waived" unless the defendant brings a new motion to dismiss. *United States v. Wirsing*, 867 F.2d 1227, 1230 (9th Cir. 1989).  This makes all the more sense given the Supreme Court's conclusion that *any* pretrial motion—even the defendant's motion to dismiss under the Speedy Trial Act—stops the statutory clock. *See United States v. Tinklenberg*, 131 S. Ct. 2007, 2016 (2011).  The proper course was to challenge the continuance on day seventy-one (or later), a course Sherer never took.  That failure waives his rights under the statute. *See* 18 U.S.C. § 3162(a)(2).

Sherer's claim lacks merit in any event.  The Speedy Trial Act excludes delay caused by a continuance "that [serves] the ends of justice" and "outweigh[s] the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A).  The district court's extension of the trial date until March 5 explained why the continuance met this standard:  The government needed time to procure DNA evidence that could definitively establish Sherer's guilt or innocence.  That decision does not amount to an abuse of discretion in light of DNA's probative value. *See United States v. Beverly*, 369 F.3d 516, 527–31 (6th Cir. 2004); *United States v. Bonds*, 12 F.3d 540, 566–67 (6th Cir. 1993).  And that is all the Speedy Trial Act demands.

*Sufficiency of the evidence.*  Both defendants challenge the sufficiency of the evidence supporting their convictions:  Sherer once, Tucker twice.  Because neither defendant moved for acquittal at the end of the trial, we must reject all three challenges unless the convictions represent a "manifest miscarriage of justice." *United States v. Tragas*, 727 F.3d 610, 617 (6th

Cir. 2013) (quotation omitted).  That means the record must be "devoid of evidence pointing to guilt."  *Id.* at 618 (quotation omitted).

Start with Sherer's argument, which boils down to a claim of mistaken identity.  Two eyewitnesses, he points out, testified that the robber in the black sweatshirt had light-colored skin—but Sherer does not.  So how could he have robbed the bank?  Simple:  Sherer was the robber wearing gray.

Tucker's claims are more complex.  He first argues that he could be tied to the robbery only through the FBI's DNA analysis, which allegedly was statistically insufficient to justify a guilty verdict.  We need not resolve the point because DNA was not the only arrow in the Government's quiver.  Tucker was the same height as the robber in black, lived just blocks away from where the getaway car was stolen, associated with Sherer at the time the robbery occurred, and called Sherer's phone twenty-seven times in the ten days before the robbery.  Once we view the evidence in the light most favorable to the Government, as we must, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979), it becomes clear that no "manifest miscarriage of justice" occurred.

Tucker separately argues that the gun used in the robbery was fake, not real.  True, a weapon must be capable of "expel[ling] a projectile by the action of an explosive" to qualify as a firearm under the statute.  18 U.S.C. § 921(a)(3).  But the government need not supply "scientific certainty" to prove the point.  *United States v. Cobb*, 397 F. App'x 128, 132 (6th Cir. 2010); *see United States v. Crowe*, 291 F.3d 884, 887 (6th Cir. 2002).  Not one but two eyewitnesses testified that Tucker's gun looked and felt like the genuine article, and the government introduced surveillance photographs that reinforced those accounts.  Tucker's doubts cannot overcome the force of the Government's presentation, especially under this deferential standard of review.  *See United States v. Conner*, 306 F. App'x 978, 981–82 (6th Cir. 2009) (rejecting an identical argument even when one witness testified that the gun looked like it was made of black plastic).

*Admissibility of Agent Nikolopoulos's testimony.*  Tucker claims the district court erred by allowing Agent Nikolopoulos to testify that Tucker's gun was real.  Because Tucker failed to make this objection at trial, we must review the court's decision for plain error, reversing only if (among other requirements) the decision affected "substantial rights."  *United States v. Johnson*,

488 F.3d 690, 697 (6th Cir. 2007).  To meet this last requirement, Sherer must show that the trial would have turned out differently but for the agent's testimony.  *United States v. Jones*, 108 F.3d 668, 672 (6th Cir. 1997) (en banc).  In light of all the other evidence arrayed against him, Sherer cannot climb that hill.

*The sentence.*  Sherer claims that his forty-five-year sentence is, in legal parlance, substantively unreasonable.  A district court has wide latitude to select an adequate sentence, and we reverse only if it abused its discretion when applying the relevant statutory factors.  *Gall v. United States*, 552 U.S. 38, 51 (2007); *see* 18 U.S.C. § 3553(a).

Sherer faults the district court for recognizing that, but for an "accounting twist," Sherer would have qualified as a career offender under the federal sentencing guidelines.  *Sherer* R. 78 at 2.  As it turns out, this ill-fated robbery wasn't Sherer's first:  Between December 1999 and January 2000, he robbed five Toledo banks.  He pleaded guilty to two of those crimes—but because he was sentenced for both on the same day, the two sentences merged into one under the guidelines' counting rules.  *See* U.S.S.G. § 4A1.2(a)(2).  The math made a difference, reducing his recommended sentence from a forty-seven-year maximum to a range topping out at thirty.  After weighing all of the § 3553(a) factors, the court applied the longer range anyway.  In its words, "there is no justice in allowing [him] . . . to escape the impact and design of the career offender sentencing range simply by . . . accident or happenstance."  R. 89 at 24.  This, Sherer says, shows that the district court placed too much emphasis on his criminal history.

We disagree.  To start, Sherer ignores the district court's careful consideration of the statutory factors.  It described his conduct as "menacing," "mean," and "threatening."  *Id.* at 22.  It noted that he robbed the credit union just "eight months" after spending ten years in jail for a previous robbery spree.  *Id.* at 21–22.  And it concluded that his "risk of recidivism [wa]s higher than in any case that [it] ha[d] ever reviewed."  *Id.* at 22.  This is precisely what an independent weighing of the § 3553(a) factors allows.

More, Sherer's argument fails on its own terms.  The guidelines are replete with "cliffs" that can lengthen—or shorten—a sentence depending on which side of the line a defendant falls.  Take the embezzlement guideline, which increases a defendant's base offense level by 8 points if he stole more than $70,000 but less than $120,000.  U.S.S.G. § 2B1.1(b)(1).  If the defendant

stole one dollar more ($120,001), his offense level goes up by 10 points, permitting a district court to sentence him at the bottom of the range or to vary below the range on that ground, among others. Indeed, our published and unpublished precedents have approved identical variances before.

Sometimes courts have varied upward, in precisely the same manner as the district court did here. In *United States v. Hardy*, Hardy would have qualified as a career offender had his rape conviction not resulted in a suspended sentence. 643 F.3d 143, 158 (6th Cir. 2011). The district court sentenced him as a career offender anyway, as "his history clearly demonstrated a violent criminal pattern and future threat." *Id.* We affirmed—just as we did in *United States v. Robinson*, 357 F. App'x 677, 689–90 (6th Cir. 2009). Robinson too did not qualify as a career offender under the guidelines; Robinson too had compiled a lengthy list of felony convictions; Robinson too was sentenced to an above-guidelines sentence that we deemed reasonable on appeal. *Id.*; *see also United States v. Minch*, 438 F. App'x 485, 490–92 (6th Cir. 2011) (affirming an upward variance because the defendant's criminal history category "substantially underrepresented" his past criminal conduct and future likelihood of reoffending); *United States v. Lanning*, 633 F.3d 469, 474–75 (6th Cir. 2011) (same); *United States v. Matheny*, 450 F.3d 633, 640–41 (6th Cir. 2006) (same).

Other times, courts have varied downward, in precisely the opposite manner as the district court did here. Take *United States v. Welch*, 555 F. App'x 538 (6th Cir. 2014). The guidelines classified Welch as a career offender with a criminal history category of VI. *Id.* at 543. Recognizing that Welch "technically score[d] as [a] career offender but d[id]n't seem to meet the profile," the district court handed down a below-guidelines sentence. *Id.* Or take *United States v. Collington*, 461 F.3d 805 (6th Cir. 2006). The guidelines placed Collington in criminal history category IV. *Id.* at 808. But because their mechanistic calculations "did not account for" the innocuous nature of his previous crimes, the district court reduced his sentence from the minimum recommended time by 36%. *Id.* at 808 n.2. Or take *United States v. Grossman*, 513 F.3d 592 (6th Cir. 2008). There, concerned that the guidelines unjustly disaggregated "an offense into very tiny increments that almost repeat one another," the district

court reduced Grossman's sentence to just over half of what the guidelines recommended. *Id.* at 594. Did the district court act unreasonably in any of these cases? Not at all, we said.

All of these cases apply the same principle to sentencing variances—up *or* down—and make one thing clear: The district court in this instance did not abuse its considerable discretion when it opted to give Sherer a sentence comparable to one that a career offender would have received.

For these reasons, we affirm.