NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0144n.06

**Nos. 20-3089/3093**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | FILED |
| | ) | Mar 18, 2021 |
| Plaintiff–Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| EVANS LANDSCAPING INC. (20-3089); DOUG | ) | COURT FOR THE |
| EVANS (20-3093), | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Defendants–Appellants. | ) | |

BEFORE: BATCHELDER, GRIFFIN, and STRANCH, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendants Doug Evans and Evans Landscaping Inc. were tried and convicted of two counts of conspiracy to commit wire fraud and three counts of wire fraud arising out of their scheme to secure government contracts through a shell company. Now on appeal, defendants raise for review the denial of their motion to suppress, various evidentiary rulings made at trial, and a jury instruction given by the district court.

We find no merit in the first two issues. Regarding the jury instruction, we conclude that the district court erred by instructing the jury that it could find that a defendant knowingly and voluntarily joined the conspiracy through deliberate ignorance. However, defendants did not

preserve this issue for review below and cannot satisfy the demanding plain-error standard on appeal. Accordingly, we affirm the judgment of the district court.

I.

A.

Defendant Evans Landscaping Incorporated is an Ohio corporation engaged in transportation, demolition, and excavation services. The company is controlled by its president, defendant Doug Evans. It is also wholly owned by a trust to which Doug Evans is the sole beneficiary.

Around 2006, Evans Landscaping began bidding on contracts for demolition work that were offered by government entities including the State of Ohio and the City of Cincinnati. The company found success in this niche and was awarded several contracts. However, government entities began to include goals for "minority participation" as one criterion for evaluating bids for public works, and those goals later became mandatory bid components. In state contracts, minority inclusion was generally expressed as a percentage of the work that would be performed by a certified "EDGE" subcontractor that met Ohio's definition of a Minority Business Entity (MBE). And the City of Cincinnati similarly considered whether a bid was made by a business designated as a Small Business Enterprise (SBE) when administering municipal contracts.

Evans Landscaping could not qualify for EDGE or SBE status. Therefore, to skirt local and state inclusion requirements, Evans Landscaping employees sought a "go-to" minority contractor to work with on public contracts. To that end, Doug Evans, Evans Landscaping's Chief Financial Officer Maurice Patterson, and other Evans Landscaping managers held a meeting to discuss setting up a new company, which they called Ergon Site Construction. At that meeting, Doug Evans told Patterson to "go ahead and set [Ergon] up" because "Evans Landscaping needed

whatever help [it] could get in securing contracts." Accordingly, Patterson, in coordination with Evans Landscaping's in-house counsel, filed the necessary paperwork to bring Ergon Site Construction into being in 2008.

Ergon's organizing documents established that it was ostensibly owned by an African American IT consultant named Korey Jordan who had done work for Evans Landscaping. But Jordan had no experience running a construction company and invested no funds of his own into Ergon's operations. Jordan understood that Ergon "was set up between [him]self and Evans to go after government contracts" and that his role was to "handle all the paperwork" for Ergon. In exchange for his work, Jordan received $1,000 a month (later increased to $2,000), and Evans Landscaping "received basically the profits from the contracts that were secured with the participation of Ergon."

Evans Landscaping and Jordan spent the next two years building up Ergon's resume with a few small jobs that were completed using Evans Landscaping resources. But in 2010, Jordan was informed that "for Ergon to exist," he had to secure EDGE certification from the State and SBE certification from the City of Cincinnati. He applied first for SBE status from the City and falsely represented that he wholly owned Ergon and personally handled the company's finances. The City approved Ergon's application in 2011, and it began bidding as an SBE for contracts offered by the City at Evans Landscaping's direction. By 2014, the City had awarded approximately 170 contracts to Ergon with a value of around $2,000,000. Ergon also applied for and received EDGE certification from the State of Ohio. Thereafter, Evans Landscaping began including Ergon as an EDGE subcontractor on its bids, but Ergon rarely, if ever, performed the work Evans Landscaping represented it to be doing.

The respective schemes began breaking down between 2013 and 2014 when local officials grew suspicious of the relationship between Evans Landscaping and Ergon. In truth, it did not require Holmesian sleuthing to deduce the relationship between the companies. For instance, Ergon sometimes used heavy machinery that bore the Evans Landscaping logo. Ergon also stored and dispatched its two work trucks from an Evans Landscaping facility—even after Patterson suggested to Doug Evans that doing so was inconsistent with making Ergon an "independent" operation. Thus, it was only a matter of time before public officials became suspicious of the cozy relationship between the companies, and they acted on their suspicion by auditing Ergon several times. The increased scrutiny, in turn, drew the attention of the FBI, which opened its own investigation in 2013. As part of that investigation, FBI Special Agent Matthew DeBlauw executed search warrants for several Evans Landscaping properties and additional search warrants for email accounts associated with Doug Evans and Korey Jordan.

B.

In 2017, the FBI's investigation bore fruit when a grand jury returned an indictment charging Evans Landscaping Inc., Doug Evans, and Jim Bailey (the Vice President of Evans Landscaping) with two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (one each for the Cincinnati SBE and State of Ohio EDGE schemes), and three counts of wire fraud in violation of 18 U.S.C. § 1343. The government also obtained pre-indictment plea agreements from Jordan, Patterson, and two other Evans Landscaping executives for their role in the Ergon schemes.

During extensive pretrial motion practice, defendants moved to suppress the evidence obtained pursuant to the search warrants. They argued that the search warrants violated the Fourth Amendment by failing to specify with particularity the places to be searched and the things to be

seized. The district court disagreed, reasoning that the search warrants had validly incorporated descriptions of the places to be searched and the things to be seized from supporting documents that were included with the warrants, so the searching officers had not violated the Fourth Amendment. Also before trial, the parties entered a stipulation that numerous documents—including emails generated or received by Evans Landscaping and Ergon employees—qualified under the business records exception to the hearsay rule and that no further authentication or foundation was necessary for the documents to be admitted as evidence.

At trial, the government called the case agent, Special Agent DeBlauw, as its first witness and had him explain background information about Doug Evans, Evans Landscaping, and Ergon, and the sources of various records and emails obtained through his investigation. The government then took DeBlauw through many of the emails and business records subject to the stipulation—in most cases without objection. At the government's direction, DeBlauw read from some of these exhibits. For instance, he read an email from Patterson to Doug Evans, with the subject line "Ergon proof." The email contained a mock-up of an Ergon business card bearing Korey Jordan's name, but Patterson told Evans, "Let me know of any changes, otherwise I need to order." DeBlauw also reviewed related exhibits, which contained invoices for Ergon's marketing materials, and emails among Evans Landscaping employees discussing their creation. Defendants objected that the exhibits were hearsay. Counsel explained that while defendants had stipulated that the records qualified under the business-records exception, they "believe[d] the proper way to admit them" was through the testimony "of their authors or recipients," and not Special Agent DeBlauw. The government responded that it was permissible for the agent to read from already-admitted exhibits, and the court agreed that it did not "have a problem as long as [the witness] stay[ed] away from

interpretation." Later, the district court granted defendants a continuing objection to Special Agent

DeBlauw "reading the documents."

After four weeks of trial, the jury returned a guilty verdict on all counts. The court

sentenced Doug Evans to twenty-one months' imprisonment and imposed $500,000 in fines upon

Evans Landscaping, among other criminal penalties. Doug Evans and Evans Landscaping timely

appealed, contesting only their convictions and not the sentences imposed by the district court.

II.

We begin by reviewing the district court's denial of defendants' motion to suppress. The

Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized." U.S. Const. amend.

IV. Defendants argue that their Fourth Amendment rights were violated by the government's

searches of two Evans Landscaping properties because the search warrants did not set forth with

particularity the places to be searched or the things to be seized.[1] Specifically, defendants observe

that the search warrants themselves contained *no* description of the places to be searched or the

things to be seized because that information was contained in separate documents identified only

as "Attachment A" and "Attachment B."

The district court rejected defendants' argument, reasoning that under our precedent, "the

particularity requirement may be satisfied through the express incorporation or cross-reference of

---

[1]To be clear, defendants do not take issue with the way the warrants were executed or which documents accompanied the warrants at the time they were executed. The sole Fourth Amendment issue on appeal is whether the warrants were valid or not at the time they were issued by the magistrate.

a supporting affidavit that describes the items to be seized, even though the search warrant contains no such description." We review the district court's particularity determination de novo. *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011).

Defendants point out that there is a difference between a search warrant and a search warrant application, and that the Supreme Court has been unequivocal that a search warrant application that meets the particularity requirement will not save a deficient warrant. *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The circumstances here, defendants posit, are exactly what *Groh* prohibited: "[i]n applying the incorporation doctrine to effectively 'borrow' Attachments A and B submitted with the search warrant applications, . . . the district court violated the basic holding of *Groh*."

We disagree. In *Groh*, the Supreme Court authorized incorporation: "We do not say that the Fourth Amendment prohibits a warrant from cross-referencing other documents. Indeed, most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, *and* if the supporting document accompanies the warrant." *Id.* at 557 (emphasis added). However, the Court could not apply the doctrine because the warrant in question "did not incorporate other documents by reference, nor did either the affidavit or the application (which had been placed under seal) accompany the warrant." *Id.* at 558. Unlike *Groh*, both elements of incorporation are met in this case, so these aspects of the warrant did not violate the Fourth Amendment.

First, the search warrant identified by name the documents to be incorporated. While Defendants argue that the incorporating language—"Attachment A" and "Attachment B"—was not sufficiently definite, our court and others have rejected this argument. *See, e.g.*, *United States v. Pritchett*, 40 F. App'x 901, 906 (6th Cir. 2002) (concluding that reference to "Attachment B" in

warrant was sufficient for incorporation); *United States v. Riesselman*, 646 F.3d 1072, 1077 (8th Cir. 2011) (concluding that "Attachment 1" was sufficient for incorporation); *United States v. Hurwitz*, 459 F.3d 463, 469–72 (4th Cir. 2006) (same for "See Attachment").

Second, it is of little import that that these attachments were sub-documents appended to the warrant application presented to the magistrate judge, rather than directly attached to the warrant. Under *Groh*, law enforcement officers may incorporate by reference a search warrant application in many circumstances, *see* 540 U.S. at 557, including those present here, so "Attachment A" and "Attachment B" are nothing more than specific portions of the search warrant application that could be permissibly incorporated by reference. Accordingly, we affirm the district court's denial of the motion to suppress.

### III.

Next, defendants challenge the district court's handling of various trial issues. We review their evidentiary arguments for an abuse of discretion where preserved, and otherwise for plain error. *See United States v. Paulus*, 894 F.3d 267, 279–80 (6th Cir. 2018).

First, they claim that the government's case "was overwhelmingly built on emails" that were hearsay. However, defendants stipulated before trial that the emails they now claim to be hearsay were business records that qualified as an exception to the hearsay rule under Federal Rule of Evidence 803(6). Given their stipulation, the district court did not abuse its discretion or plainly err by admitting the business records.

Second, defendants point out that "[e]ven if a defendant stipulates to the admission of certain emails, such stipulation does not extend to hearsay-within-hearsay." True enough; admission of such evidence is conditioned upon each level of hearsay's being subject to the general prohibition on hearsay. *See* Fed. R. Evid. 805. But defendants have not directed us to any hearsay-

within-hearsay erroneously admitted by the district court. They point to only one specific example—an email sent by Evans Landscaping employee Adam Rhoades to two coworkers—that reads:

> Jim [Bailey] asked me to send this to you. This realty company needs two bids on this demo. I have attached my Evans bid. Can you type up a bid from Ergon and send it to her. Please do it in [W]ord or a different layout so it does not look the same as this bid. Make your bid $3000 more and if possible email it from [an Ergon employee's] email.

The only arguable hearsay-within-hearsay is the assertion "Jim asked me to send this to you." (*Id.*) But even if this was offered for the truth of the matter asserted (and it likely was not), then it qualifies as a non-hearsay opposing party's statement. The statement in the email was offered against Bailey (Evans Landscaping's Vice President), who was a defendant; Rhoades was Bailey's employee (as well as an employee of Evans Landscaping, Inc., itself a defendant); and Rhoades's assertion concerned a matter within the scope of that employment relationship while it existed. *See* Fed. R. Evid. 801(d)(2)(D). Accordingly, each level of hearsay (the email and the embedded assertion by Rhoades) is supported by an applicable exception or exclusion (the former, as a business record; the latter, as an opposing party's statement) so the email was admissible under Federal Rule of Evidence 805.

Third, defendants assert that "the right of confrontation is fundamental," and because they were supposedly deprived of that right by the admission of the business records, "their convictions should be reversed on this ground alone." This argument fails because business records are inherently nontestimonial, and therefore do not implicate the Confrontation Clause. *See United*

*States v. Baker*, 458 F.3d 513, 519 (6th Cir. 2006); *see also Crawford v. Washington*, 541 U.S. 36, 56 (2004) (observing that business records "by their nature [are] not testimonial").

Fourth, defendants claim that the government impermissibly used Special Agent DeBlauw as a summary witness. "A defendant may indeed be prejudiced if a law enforcement officer is able to introduce otherwise inadmissible evidence by giving an overview of the government's case at the outset of the trial . . . ." *United States v. Tragas*, 727 F.3d 610, 615 (6th Cir. 2013). However, the record refutes defendants' contention that Special Agent DeBlauw acted as a summary witness, because he "cannot be said to have summarized anything; rather, he was merely reading directly from" properly admitted business records that were already in evidence. *Id.* "As long as the evidence itself is properly admitted pursuant to the Rules of Evidence and does not run afoul of other safeguards like the Confrontation Clause, we do not see how a defendant could be prejudiced if the evidence is read aloud to the jury." *Id.* at 614; *see also United States v. Chambers*, 441 F.3d 438, 456–57 (6th Cir. 2006) (finding no unfair prejudice where a police officer read portions of a defendant's previously admitted diary to the jury).[2] That is the case here.

Fifth, defendants protest that in some instances, the senders and/or recipients of the emails were not called to testify, so defendants were deprived of a chance to cross-examine them. This is just another gloss on their argument that the admission of the emails violated their right to confront the witnesses against them, which we have already rejected. We are aware of no authority

---

[2]This likewise dooms defendants' argument that the district court abused its discretion by declining to give a summary-witness limiting instruction to the jury.

to support the proposition that emails are inadmissible unless their authors or recipients are called as witnesses, and defendants supply none.

Finally, defendants claim it "was error for the district court to permit the Government to argue appellants' guilt to the jury in its closing argument by characterizing and suggesting inferences be drawn from proof never discussed with a witness during the parties' presentation of their proof." In short, defendants cry foul because some of the emails and business records admitted into evidence during Special Agent DeBlauw's testimony were not specifically raised and reviewed during the government's case, but the government nevertheless discussed them during its closing argument. Again, we see nothing objectionable. The government may rely on properly admitted evidence to argue that it met its burden of proof. *See United States v. Ham*, 628 F.3d 801, 811 (6th Cir. 2011) ("Defendant cites no authority precluding the Government from referring to properly admitted evidence that is essential to the Government's case-in-chief during closing arguments.").

For these reasons, we conclude that the district court did not err in its handling of these matters at trial, so defendants' argument for cumulative error must also fail.

IV.

Finally, defendants argue that the district court improperly instructed the members of the jury by stating that they could find that the defendants joined the alleged conspiracy through deliberate ignorance.[3]

"An instruction regarding 'deliberate ignorance' explains to the jury that a statutory knowledge element can be satisfied by 'the deliberate avoidance of knowledge.'" *United States v.*

---

[3]Defendants also point out that the district court deviated when reading this instruction to the jury, and that the government offered its own interpretation of it during closing argument.

*Patel*, 651 F. App'x 468, 471 (6th Cir. 2016) (quoting *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012)). The instruction is to "be used sparingly" because of "the risk of a conviction based on mere negligence, carelessness or ignorance." *Mitchell*, 681 F.3d at 876 (citation omitted). But in an appropriate case, a defendant's deliberate avoidance of knowledge can establish that he knew of the conspiratorial purpose of a criminal agreement. For example, in *Patel*, our court endorsed the following instruction in a healthcare fraud case, where some defendants had claimed not to know that their employer was committing fraud:

> [i]f you are convinced that the defendants . . . deliberately ignored a high probability that Physician[']s Choice . . . w[as] engaged in health care fraud . . . you may find that one or more of these defendants knew that the company would engage in health care fraud. But to find this, you must be convinced beyond a reasonable doubt that the defendants . . . were aware of a high probability that Physician[']s Choice . . . w[as] engaged in health care fraud . . . and that the defendants deliberately closed their eyes to what was obvious.

651 F. App'x at 471 (alterations in original). By contrast, the jury here was instructed that if it found a defendant "had deliberately ignored that a high probability that a criminal agreement existed," it could "find that *he knowingly and voluntarily joined that agreement*" (emphasis added). This was erroneous because "the existence of an agreement or the entry into a conspiracy may not be proved by deliberate ignorance." *United States v. Warshawsky*, 20 F.3d 204, 211 (6th Cir. 1994).

That said, the government correctly notes that defendants failed to preserve this issue for review because they did not object on grounds that the jury instruction improperly stated the law

---

Neither of these observations supplements their argument in a meaningful way. The court's deviation from the written instructions was exceedingly minor, and the government's statement directly tracked the court's written instruction. Further, all three claims are subject to plain-error review for the reasons explained below. In short, the analysis is unchanged for all three arguments, so we address them together.

below.[4]  We recognize that defendants' first chance to object to the wording of the instruction came mere minutes before it was read to the jury.  At that point, the court offered counsel "a couple of minutes to adjust" to the final instructions as they were displayed on courtroom technology, and the court's law clerk volunteered to email fresh copies to counsel.  But counsel did not object then, contemporaneously when the erroneous instruction was read to the jury, or at the close of the jury-instruction phase, when the court inquired whether the parties had any issues to take up at a sidebar before closing argument.  Therefore, defendants were afforded an opportunity to object to the erroneous instruction and failed to do so.  Accordingly, we review for plain error only.  *See United States v. Semrau*, 693 F.3d 510, 527 (6th Cir. 2012).

Because we are limited to plain-error review, it is defendants' burden to establish that, "taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice."  *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006) (citation omitted).  This, they cannot do.

First, we observe that by the time the court instructed the jury on deliberate ignorance, it had already explained that to find a defendant guilty of conspiracy to commit wire fraud, one of the elements of the offense was that he "knew of the conspiracy's main purpose, and that he voluntarily joined it intending to help or advance or achieve its goals."  The court also cautioned the jury that "proof that a defendant simply knew about a conspiracy, or was present at times, or associated with members of the group, is not enough, even if he approved of what was happening or did not object to it."  Accordingly, we conclude that, taken as a whole, the district court's

---

[4]At the charge conference, defendants objected that a deliberate ignorance instruction was "not supported by the evidence."  That was not specific enough, however, to preserve the issue now challenged on appeal.  *See United States v. Corp*, 668 F.3d 379, 387–88 (6th Cir. 2012); Fed. R. Crim. P. 30(d).

instructions "sufficiently conveyed the elements of the charge" even though the court later conflated deliberate ignorance with a defendant's entry into the conspiracy. *United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010).

Furthermore, the evidence overwhelmingly established that defendants joined the conspiracy and specifically intended to further its purpose, so even if the court's instructions were confusing, they were not likely to cause a grave miscarriage of justice. Here are but a few examples establishing Doug Evans' entry into (and furtherance of) the conspiracy that were available to the jury:

- Patterson sent an email to Doug Evans asking whether he had decided to "go forward" with Ergon and testified at trial that Evans' approval was necessary before Ergon could be created.

- Doug Evans gave the go-ahead for Evans Landscaping to spend $2,000 creating Ergon decals and logos and personally approved the designs.

- In 2011, after Ergon had been certified by the City, Doug Evans sent an email asking, "What is the next step we need to do with [E]rgon?? We do want to keep it going but have more organization and control."

- Doug Evans personally guaranteed Ergon's loan from PNC Bank, which it used to purchase two work trucks.

- Doug Evans rejected Patterson's suggestion that the trucks leased to Ergon be stored off Evans Landscaping property (to better obscure the relationship between the companies), retorting, "[n]obody is going to tell me how to run my business."

- Doug Evans required that Jordan obtain pre-approval before spending Ergon's funds and personally directed Evans Landscaping employees to "stop" Jordan's credit card when he made an unauthorized purchase.

Thus, the evidence shows that Doug Evans—as someone without any documented ownership or managerial interest in Ergon—was personally involved in all aspects of the company's operations. He was everywhere: approving Ergon's logos and business cards, authorizing minor expense requests submitted by Ergon's supposed owner, and directing where Ergon's trucks be kept.

Beyond the day-to-day, Doug Evans also made the big decisions. It was his word that put the scheme into action, and his direction that kept Ergon in business as time went on and the government contracts rolled in. In short, Doug Evans entered the conspiracy at its founding and furthered the purpose of the conspiratorial agreement in two respects: (1) by maintaining and bolstering Ergon's façade to deceive government officials about the relationship between it and Evans Landscaping; and (2) by exercising complete control over Ergon's operations to ensure that the fruits of the fraud benefitted Evans Landscaping. Accordingly, the "probable effect" of the court's erroneous deliberate ignorance instruction on the jury verdict was "inconsequential." *United States v. Carney*, 387 F.3d 436, 449 (6th Cir. 2004); *see also United States v. Rayborn*, 491 F.3d 513, 521 (6th Cir. 2007) (assessing the evidence to determine whether district court's deliberate ignorance instruction affected defendant's substantial rights).[5] Because defendants have not established that the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice, we will not exercise our discretion to correct the unpreserved error.

V.

For these reasons, we affirm the judgment of the district court.

---

[5]To the extent the corporate entity has mounted an independent challenge to the jury instructions, two Evans Landscaping employees, Patterson and Moeller, pleaded guilty to conspiracy to commit wire fraud and testified to their knowledge and participation in the Ergon scheme within the scope of their employment with Evans Landscaping at trial. *See, e.g.*, R. 226 at PID 3528 (Patterson: "We set up and ran . . . Ergon Construction to appear to be an independent SBE/MBE when, in fact, it wasn't. That was the lie, and that was the fraud that was involved."). Thus, the evidence at trial conclusively established that Evans Landscaping entered the conspiracy through the acts of its agents.